# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

125   9
36a  423
125    9
197  ⁹204

---

THE PEOPLE *ex rel.* Commissioners of Highways

*v.*

THE BOARD OF SUPERVISORS OF MADISON COUNTY.

*Filed at Springfield May 9, 1888.*

1. BRIDGES—*county aid—conditions—as to the relative cost and assessed valuation, how and by whom to be ascertained.* On application by the commissioners of highways against a county board, to compel the latter to appropriate one-half of the cost of the erection of a bridge, the question whether the cost of the proposed bridge will be more than twenty cents on the one hundred dollars of the last preceding assessment roll, is not one for the determination of a jury, but to be found by the court from an inspection of the record evidence before it.

2. The amount of the assessed valuation of the taxable property in a town on the latest assessment roll, and the estimated cost of the building of bridges by the commissioners of highways, are all matters of record, and are therefore provable only by the record, and should be found by the court from an inspection of the record.

3. The mere ascertaining of an amount by the multiplication, addition or subtraction of given numbers, presents no question of fact for a jury. In such cases there can be but one result, and the court may either itself perform the labor of ascertaining it, or intrust that labor to any competent individual. In legal presumption the court knows what is the result.

4. SAME—*necessity for a bridge—and deficit in the sixty cents tax—by whom to be determined.* Whether a proposed bridge is necessary, or

whether the major part of the sixty cents tax levied by the commissioners will be required for the ordinary repair of roads and bridges, being matters within the discretion and control of the commissioners, are questions the truth of which the county board have no right to inquire into. With respect to these questions, all they have a right to do is to determine, from the petition presented, whether the commissioners have acted upon them and decided them in the affirmative.

5. BOUNDARY—*as to land lying along a water-course, or public highway.* It is an established inference of law, that a conveyance of land bounded on a highway or river carries the fee to the center of the. highway or river, provided the grantor, at the time, owned to the center, and there be no words or specific description to show a contrary intent.

6. But it is competent for the riparian proprietor to sell his upland to the top or edge of the bank upon a river, and to reserve the stream or flats below high-water mark, if he does so by clear and specific boundaries.

7. A grant running to a monument standing on the bank of a stream, and from thence running by the river on or along the river, etc., does not restrict the grant to the bank of the stream, for the monuments, in such case, are only referred to as giving the directions of the lines to the river, and not as restraining the boundary on the river.

8. If the grantor, however, after giving the line to the river, bounds the land by the bank of the river, or describes the line as running along the bank of the river, or bounds it upon the margin of the river, this will show that he does not consider the whole *alveus* of the stream a mere mathematical line, so as to carry his grant to the middle of the river.

9. SAME—*boundary of a city—construed.* A charter of a city, in defining its limits, used this language: "Beginning at the north-east corner of section 11, etc., and running thence west on the section line to Gordon's branch; thence down the meanderings of said branch to the margin of Cahokia creek; thence down on the left bank of said creek to the line between sections 3 and 4," etc.: *Held,* that the line was the middle of Gordon's creek, but as to Cahokia creek the rule was different, the line there being limited to the left bank of that stream.

10. In such case, the boundary does not run where the water and land meet at low water, low-water mark not being the bank of the stream. Low-water mark is the point to which the water recedes at its lowest stage, while the banks are the elevations of land which confine the waters in their natural channel when they rise to the highest and do not overflow the banks.

11. ERROR WILL NOT ALWAYS REVERSE—*admission of oral evidence of matters proved by the record.* On an application by commissioners of highways for a *mandamus* against the county board, to compel the latter to furnish aid in the construction of bridges, the admission of oral evidence of the action of the commissioners, if error, can work no harm, when the same matters are also proved by the record of their proceedings.

This is an original application to this court, by the commissioners of highways of the township of Edwardsville, in Madison county, for a writ of *mandamus*, against the board of supervisors of that county. It is alleged in the petition that the said commissioners of highways did, on the 31st day of March, A. D. 1886, present to the board of supervisors of said county, then in session, a petition, estimate and affidavit, as follows:

"The undersigned, commissioners of highways of the town of Edwardsville, in said county, would respectfully represent that a bridge needs to be built over the Cahokia creek, in said town, where the same is crossed by the highway leading from the city of Edwardsville, in said town, to the city of Alton, in said county; and also that a bridge needs to be built over said Cahokia creek, in said town, where the same is crossed, at the "Lucy Wheeler farm,' by the highway leading from said city of Edwardsville, in said town, by way of the 'old fair ground,' to Venice, in said county, in which said work the said town of Edwardsville is wholly responsible; that the cost of each of said bridges will be $1750, and the total cost of building both of said bridges will be $3500, which sum of $3500 will be more than twenty cents on the one hundred dollars on the latest assessment roll of said town, and that the levy of the road and bridge tax for the present year in said town is the full amount of sixty cents on each one hundred dollars allowed by law for the commissioners to raise, the major part of which is needed for the ordinary repair of roads and bridges; that said town has provided and appropriated for the building of said bridges the sum of $1750, being one-half the total estimated cost thereof, wherefore said commissioners of highways of said town hereby petition you for aid, and for an appropriation from the county treasury of a sum sufficient to meet one-half the expense of said bridges.

"Dated at Edwardsville, Illinois, this 30th day of March, A. D. 1886. WILLIAM SMOLA,
JOHN F. KIENLEN,
C. M. SCHWARZ,
*Commissioners of Highways*."

"STATE OF ILLINOIS, MADISON COUNTY, ⎰ ss.    Board of Comrs.
    *Town of Edwardsville.*    ⎱    of Highways.

"We, the undersigned, commissioners of highways of the town of Edwardsville, hereby state that we have made a careful estimate of the probable cost of the erection of two bridges across Cahokia creek, in said town, one where the same is crossed by the highway leading from the city of Edwardsville, in said town, to the city of Alton, in said county, and one where the same is crossed, at the 'Lucy Wheeler farm,' by the highway leading from the said city of Edwardsville, in said town, by way of the 'old fair ground,' to Venice, in said county, and we do estimate that the probable cost of each of said bridges will be $1750, and that the total cost of said bridges will be $3500.

"Witness our hands this 30th day of March, A. D. 1886.

WILLIAM SMOLA,
JOHN F. KIENLEN,
C. M. SCHWARZ,
*Commissioners of Highways.*"

"STATE OF ILLINOIS, MADISON COUNTY, ⎰ ss.
    *Town of Edwardsville.*    ⎱

"William Smola, John F. Kienlen and C. M. Schwarz, commissioners of highways of the town of Edwardsville, being each duly sworn, on oath say that the construction of the bridges mentioned in the estimate to which this affidavit is attached, across Cahokia creek, in said town, is necessary, and that the same will not be made more expensive than is needed for the purpose desired.    WILLIAM SMOLA,
JOHN F. KIENLEN,
C. M. SCHWARZ,
*Commissioners of Highways.*"

Subscribed and sworn to.

The petitioners further represent, that all the matters and things in the said petition, estimate and affidavit set forth, were and are true, as therein stated, and the same were, upon

presentation of said petition, estimate and affidavit to said board of supervisors aforesaid, made to appear to said board of supervisors, and that said petition, estimate and affidavit were presented to said board, as aforesaid, in good faith, and for the objects and purposes therein set forth, and that upon presentation thereof, as aforesaid, the same were, by said board, referred to its committee on roads and bridges, and afterwards, on the 14th day of September, A. D. 1886, being one of the days when said board was in session, at its regular annual meeting, said board denied the prayer of said petition, and refused, and still does refuse, to make said appropriation, although it was its plain duty to do so under the provision of the statute of this State. Wherefore the petitioners pray this court to order a writ of *mandamus* to issue from this court, directed to the said board of supervisors of Madison county, Illinois, commanding it forthwith to appropriate the said sum of $1750 out of the treasury of said county, to be expended in paying for one-half the cost of constructing two bridges in the town of Edwardsville, in said county, as prayed for in said petition of said commissioners of highways, and that said board of supervisors may be summoned, in accordance with the rules and practice of this court, to answer this petition, and upon a hearing thereof, this court will make such order herein as under the law may be justified, etc. The petition is subscribed by the commissioners, and sworn to.

Respondents filed ten pleas, but demurrers were sustained to the first, second, seventh, eighth and ninth pleas. The third, fourth, fifth, sixth and tenth pleas are as follows:

"*Third plea*—And for a further plea in this behalf, these respondents say that the said petitioners ought not to have a writ of *mandamus* against these respondents in this behalf, because they say, for said year in the said petition named, the levy of the road and bridge tax in said town of Edwardsville was not for the full amount of sixty cents on each one hundred dollars on the latest assessment roll of said township, but was

less than said amount; and of this they put themselves upon the country.

"*Fourth plea*—And these respondents, for a further plea in this behalf, come and defend, etc., and say the petitioners ought not to have a writ of *mandamus* against them, because they say, when said petition of said commissioners of highways was presented to said board of supervisors, the matters and allegations in said petition contained were investigated by the said board of supervisors, and it did not appear to said board, or these respondents, that at the time said petition was so presented, nor at any subsequent time, a major part of the full amount of the road and bridge tax of Edwardsville township, of sixty cents on the one hundred dollars of the latest assessment roll for the year, in said petition mentioned and claimed to be levied, was needed for the ordinary repair of roads and bridges in said town of Edwardsville, but on the contrary, these respondents say that the major part of said tax of said sixty cents on the said one hundred dollars was not needed for the ordinary repair of roads and bridges in said township at the time said petition was presented to said board, nor at any time subsequent thereto; and of this these respondents put themselves upon the country.

"*Fifth plea*—And these respondents, for a further plea in this behalf, come and defend, etc., and say the petitioners ought not to have a writ of *mandamus* against them, because these respondents say that the major part of the full amount of the road and bridge tax for said Edwardsville township, for the year in said petition mentioned, alleged to be levied by said highway commissioners, of sixty cents on each one hundred dollars allowed by law to be raised by said highway commissioners for said tax, was not needed for the ordinary repair of roads and bridges in said township when said petition for said aid was presented to said board of supervisors, nor at any other time; and this these respondents pray may be inquired into by the country.

"*Sixth plea*—And these respondents, for a further plea in this behalf, come and defend, etc., and say the petitioners ought not to have a writ of *mandamus* against them, because they say the cost of the bridges mentioned in said petition, and to be built, for which aid was asked, would together be less than twenty cents on the one hundred dollars of the latest assessment roll in said township; and of this they put themselves upon the country.

"*Tenth plea*—And for a further plea in this behalf, leave, etc., according, etc., the respondents say that the petitioners ought not to have their writ of *mandamus* against these respondents in this behalf, because they say that the east end and part,—to-wit, the east piers, abutments, and all the approaches thereto,—of said proposed bridge in said petition of the petitioners mentioned as crossing said Cahokia creek on the public highway leading from the city of Edwardsville to the city of Alton, in said county, is within the corporate limits of the city of Edwardsville, in the county of Madison, and State of Illinois, and that the cost of constructing the other proposed bridge near the 'Lucy Wheeler farm' will be less than twenty cents on the one hundred dollars on the latest assessment roll of said town of Edwardsville at the time said county board was so petitioned, and that the said town of Edwardsville, before and at the time of presenting said petition for aid to said county board, had raised a sum of money sufficient to pay for said last named bridge, exclusive of the amount needed for the ordinary repair of roads and bridges; and this they are ready to verify, wherefore these respondents pray if petitioners ought to have their aforesaid writ of *mandamus*," etc.

Relators file their replication to respondents' tenth plea, as follows: "And the relators, as to the plea of the respondents by them tenthly above pleaded, by leave of court say, that they, (the relators,) by reason of anything in that plea alleged, ought not to be barred from having their aforesaid writ of *mandamus*, because they say that the bridge mentioned in said

plea, proposed to be built across Cahokia creek, on the public highway leading from the city of Edwardsville to the city of Alton, is intended to take the place of an old wooden bridge now across said creek on said highway; that said old bridge rests upon two stone abutments, and no more, one of which abutments is on the west bank of said creek, and the other of said abutments is on the east bank of said creek; that said proposed bridge is to be an iron bridge, and is intended to be placed upon said two abutments, and upon no other abutments or piers, and that the estimated cost of $1750, mentioned in the petition herein, for building said proposed bridge, includes no expense or work on the said abutment on the east bank of said creek, or any approach thereto; and this the relators are ready to verify, wherefore they pray judgment and their writ of *mandamus,*" etc.

Questions of fact were certified to the Macoupin circuit court, to be tried by a jury. The questions, and the findings of the jury returned in answer thereto, were as follows:

"We, the jury impaneled and sworn to try the issues in the above entitled cause, make the following answers to the following questions, being the seven questions submitted by relators:

"*First*—Was the levy of the road and bridge tax in the town of Edwardsville, in the year 1885, for the full amount of sixty cents on each one hundred dollars on the latest assessment roll of said town of Edwardsville? Answer, yes.

"*Second*—Was the major part of said road and bridge tax, of sixty cents on each one hundred dollars on the latest assessment roll of said town of Edwardsville, needed for the ordinary repair of roads and bridges in said town, during the year for which said tax was levied? Answer, yes.

"*Third*—Will the cost of the two bridges mentioned in relators' petition for *mandamus,* be together more than twenty cents on the one hundred dollars of the assessment roll in the town of Edwardsville for the year 1885? Answer, no.

"*Fourth*—How much, if any, of the east end of the bridge mentioned in relators' petition, herein proposed to be built across Cahokia creek, on the public highway leading from the city of Edwardsville to the city of Alton, is in the corporate limits of said city of Edwardsville? Answer, none.

"*Fifth*—How much, if any, of the east abutment of the present bridge across Cahokia creek, on the public highway leading from the city of Edwardsville to the city of Alton, is in the corporate limits of the city of Edwardsville? Answer, none.

"*Sixth*—Is the bridge mentioned in relators' petition, and proposed to be built across Cahokia creek, on the public highway leading from the city of Edwardsville to the city of Alton, intended to take the place of an old wooden bridge now across said creek, on said highway, and does said old bridge rest upon two stone abutments, and no more, and is one of said abutments on the west bank of said creek and the other on the east bank of said creek, and is said proposed bridge to be an iron bridge, and is it intended to be placed upon said two abutments, and upon no other abutments or piers? Answer, yes.

"*Seventh*—Does the estimated cost of $1750 for building said bridge proposed to be built across Cahokia creek, on the highway leading from the city of Edwardsville to the city of Alton, include any expense or work on the east abutment of the old wooden bridge now across said creek, on said highway, or an approach to said abutment, or approach to the east end of said proposed bridge? Answer, none."

Answers to two interrogatories submitted by the respondents:

"*First*—How much, if any, of the east end of the bridge mentioned in relators' petition, proposed to be built across Cahokia creek, on the public highway leading from the city of Alton to the city of Edwardsville, is in the corporate limits of said city of Edwardsville? Answer, none.

"*Second*—If the jury answer that part of said east end is within the corporate limits of the city of Edwardsville, will it

2—125 ILL.

be necessary to expend any money on that part of said bridge, or the east pier or abutment or approach to said bridge, which they find is within the corporate limits of the city of Edwardsville, for the proper building of the same? Answer, we find that no part of said bridge is within the limits of the city of Edwardsville."

The court, at the instance of the relators, gave the following instruction to the jury:

"The court instructs the jury, that the east margin of Cahokia creek is the boundary line of the city of Edwardsville, where the bridge mentioned in relators' petition is proposed to be built across said creek, on the highway leading from the city of Edwardsville to the city of Alton."

Respondents asked the court to instruct the jury as follows, but the court refused to do so:

"1.   The court instructs the jury, as a matter of law, that the corporate limits of the city of Edwardsville, as bounded by the Cahokia creek, extend to the middle of the stream of said creek.

"2.   The court instructs the jury, as a matter of law, that the corporate limits of the city of Edwardsville, as bounded by Cahokia creek, extend to low water mark of said creek."

After the jury had returned their answers to the interrogatories aforesaid, but before they were discharged by the court, relators requested the court to instruct them as follows:

"If the jury find, from the evidence, that the cost of building the two bridges mentioned in relators' petition is undisputed in the evidence, and amounts to $3500, and that the total of the assessment roll of the town of Edwardsville, in the year 1885, is $1,013,423, then twenty cents on the one hundred dollars of said assessment roll is less than the cost of said two bridges, and the jury ought to answer the third question submitted to them, in the affirmative."

The court, holding that the instruction was asked too late, declined to give it.

Messrs. WISE & DAVIS, and Messrs. BURROUGHS & WARNOCK, for the relators:

This court ought to award the writ, because from the pleadings, evidence and verdict it clearly appears that relators have brought themselves within the rulings of this court. *People* v. *Iroquois County*, 100 Ill. 640; *Town of New Boston* v. *Mercer County*, 110 id. 197; *Will County* v. *People*, id. 511; *Logan County* v. *People*, 116 id. 466; *Stark County* v. *People*, 118 id. 459.

The language used in the charter defining the city boundaries, clearly excludes Cahokia creek, and confines the same to the bank. *Rockwell* v. *Baldwin*, 53 Ill. 19; *Hatch* v. *Dwight*, 17 Mass. 298; *Dunlap* v. *Stetson*, 4 Mason, 349; *Babcock* v. *Utter*, 1 Abb. 27; *Watson* v. *Peters*, 26 Mich. 516; *Daniels* v. *Cheshire*, 20 N. H. 85; 3 Washburn on Real Prop. 411, note.

Messrs. DALE & BRADSHAW, and Mr. GEORGE F. McNULTY, for the respondents:

The general doctrine that grants of lands bounded upon rivers or their margins above tide-water, carry the exclusive right and title of the grantee to the center thread of the current, unless the terms clearly denote the intention to stop at the margin of the river, has been too long established and too firmly adhered to by this court to be now questioned. *Trustees of Schools* v. *Schroll*, 120 Ill. 509; *Helmer* v. *Castle*, 109 id. 672; *Piper* v. *Connelly*, 108 id. 651, and authorities cited.

The Illinois decisions are in harmony with the decisions of other courts and text-writers on this question. *State* v. *Canterbury*, 8 Fost. 195, and New Hampshire cases there cited; *Luce* v. *Cawley*, 24 Wend. 451; 2 Smith's Lead. Cases, (8th ed.) part 1, p. 175; *Johnson* v. *Anderson*, 18 Maine, 76; *Ex parte Jennings*, 6 Cow. 518; Angell on Water-courses, sec. 23; Gould on Waters, sec. 197, p. 348, note 5; 3 Kent's Com. 428; *Hayes* v. *Bowman*, 1 Rudolph, 428; 3 Washburn on Real Prop. chap. 5, sec. 4.

Though land, nominally and in terms, is bounded on the margin of a river, it extends, by construction of law, to the center or thread of the stream.

The word "bank" may be used as synonymous with the river; and it is plain that the naked circumstance of bounding a grant on, to, or by a bank, can not exclude the stream any more than bounding on the margin of the stream. Angell on Watercourses, secs. 23, 24.

The apparent exceptions, in the cases cited by relators, to this general rule, are governed by particular facts and surrounding circumstances that do not exist in this case. And even where the particular facts and surrounding circumstances show that the grant is to the margin of the water's edge, and not to the center of the stream, then the grant stops, not at the extreme high water, but goes to the low-water mark. 13 N. Y. 296; 4 Hill, 369; 20 Wend. 150.

The grant or charter defining the limits of a city is construed the same as grants by deed, when the boundary is to be ascertained, and therefore is construed against the grantor. *State* v. *Canterbury*, 8 Fost. 196.

The commissioners of highways can not prove these proceedings by parol evidence. 1 Dillon on Mun. Corp. secs. 229, 247, 237, 238; *Mayhew* v. *District Gay Head*, 13 Allen, 129; *McHaney* v. *Marion County*, 77 Ill. 488; *Spangler* v. *Jacoby*, 14 id. 297; *Steckart* v. *East Saginaw*, 22 Mich. 104; *Stevenson* v. *Bay City*, 26 id. 44; *Morrison* v. *Lawrence*, 98 Mass. 219; *Hunneman* v. *Fire District*, 37 Vt. 40; *Louisville* v. *McKegney*, 7 Bush, 652; *The Board* v. *Chitwood*, 8 Ind. 504; *Jordan* v. *School Directors*, 38 Maine, 169.

Mr. Justice Scholfield delivered the opinion of the Court:

The answer of the jury to the third interrogatory propounded on behalf of the relators is palpably erroneous, but the question there propounded is one not proper for the determination

of a jury, and the error in their verdict may, for that reason, be disregarded.

The amount of the assessed valuation of the taxable property of the town of Edwardsville for the year 1885, and the estimated cost of building the two bridges, are all matters of record, and therefore provable only by the record. See the several sections of the Revenue act, in relation to assessments, (Rev. Stat. 1874, chap. 120,) and section 19 of "An act in regard to roads and bridges in counties under township organization, approved June 23, 1883." Hence the denial of the allegations of the petition, that the cost of the two bridges would be more than twenty cents on the one hundred dollars on the latest assessment roll, etc., was in the nature of a plea of *nul tiel record,* which the court must try by an inspection of the record. 2 Tidd's Pr. (3d Am. ed.) 741, \*743; *Carson* v. *Pearl,* 4 J. J. Marsh. 92; *Brody* v. *Commonwealth,* 1 Bibb, 517; *Gray* v. *Pinquey,* 17 Vt. 419.

The mere ascertaining of an amount by the multiplication, addition or subtraction of given numbers, presents no question of fact for a jury. In such cases there can be but one result, and the court may either itself perform the labor of ascertaining it, or intrust that labor to any competent individual. In legal presumption, the court knows what is the result. It is upon this principle, that where an action is brought for a sum certain, or which may be made certain by computation, the court can enter judgment for the plaintiff for the amount of his damages, without a writ of inquiry. 2 William's Saunders, 107 a, notes b, c; *Renner et al.* v. *Marshall,* 1 Wheat. 215, \*216; *Rust* v. *Frothingham et al.* Breese, 331.

The evidence before us clearly shows that this issue must be decided in favor of the relators. No objection is perceived to the record evidence, and none is insisted upon in argument. The assessed valuation of the taxable property in the town of Edwardsville for the year 1885, which was the last assessment before presenting the petition to the board of supervisors, is

$1,013,423, twenty per cent upon which can only be $2026.84, while the estimated cost of the bridges is $3500.

Question is made as to the sufficiency of the evidence to sustain the allegation that the major part of the road and bridge tax of sixty cents on each one hundred dollars on the last assessment roll of the town, was needed for the ordinary repair of roads and bridges in the town during the year for which the tax was levied. We think the evidence warranted the finding of the jury in that respect. But we held in *Board of Supervisors of County of Macon* v. *People,* 121 Ill. 616, that this question belongs solely to the commissioners of highways. We there said, among other things: "But whether the proposed work is necessary,—that is, whether public interest and convenience demand it,—or whether the major part of the sixty cents tax levied by the commissioners will be required for the ordinary repair of roads and bridges, being matters within the discretion and judgment of the commissioners, are questions the truth of which the board of supervisors have no right to inquire into or determine. With respect to these questions, all they have a right to do is to determine, from the petition presented to them, whether the commissioners have acted upon them, and decided them in the affirmative."

Complaint is made that the court permitted oral evidence to go to the jury, of the action of the commissioners of highways, as affecting the present controversy. But the same thing which this evidence tended to prove was proved by the record of the commissioners of highways, which was read in evidence, and therefore no harm was done the respondents by the oral evidence.

The objection most seriously urged, is against the answers to the fourth and fifth interrogatories propounded by the relators, and to the first and second interrogatories propounded by the respondents; and this involves, first, a question of law, as to the proper construction of the language of the charter of the city of Edwardsville, respecting a part of its boundary;

and secondly, a question of fact, with respect to the location of the east end of the bridge.

The city is incorporated under a special charter, which, in defining its limits, uses this language: "Beginning at the north-east corner of section No. 11, town 4, range 8, west of the third principal meridian, and running thence west on the section line, to Gordon's branch; thence down the meanderings of said branch, to the margin of Cahokia creek; thence *down on the left bank of said creek,* to the line between sections Nos. 3 and 4, in said township," etc. It is undoubtedly the established inference of the law, that a conveyance of land bounded on a highway or river, carries the fee to the center of the highway or river, provided the grantor, at the time, owned to the center, and there be no words or specific description to show a contrary intent; and we shall assume, for the present, at least, that this rule is equally as applicable to boundary lines of towns, etc., as to private grants. But it is competent for the riparian proprietor to sell his upland to the top or edge of the bank of a river, and to reserve the stream or flats below high-water mark, if he does it by clear and specific boundaries. 3 Kent's Com. (8th ed.) pp. 534, 535, *434. And so we said in *Rockwell* v. *Baldwin et al.* 53 Ill. 22: "It is, however, but a presumption, for one man may own the bed of such a stream, and another may own the banks; and where, in a deed conveying land, the boundary is limited to the bank of the stream, instead of bounding it on or along the stream, the presumption must fail. The party must be controlled by the terms of his deed." There, the language, "thence down the west line of the creek," was held, in connection with certain circumstances tending to show the interest of the grantor to be to that effect, to establish the boundary line on the bank of the creek.

In *Child* v. *Starr,* 4 Hill, 369, to which we referred as supporting the views thus expressed, WALWORTH, Chancellor, said: "Running to a monument standing on the bank, and from

thence running *by the river* or *along the river*, etc., does not restrict the grant to the bank of the stream, for the monuments in such cases are only referred to as giving the directions of the lines *to the river*, and not as restricting the boundary *on the river*. If the grantor, however, after giving the line to the river, bounds his land by the *bank* of the river, or describes the line as running *along the bank* of the river, or bounds it upon the *margin* of the river, he shows that he does not consider the whole *alveus* of the stream a mere mathematical line, so as to carry his grant to the middle of the river."

In *Howard* v. *Ingersoll*, 13 How. 381, one of the boundary lines between the State of Georgia and the State of Alabama is described as "running thence up the said river Chattahoochee, and along the western bank thereof, to the great bend thereof," etc. The court, in speaking of this language say: "If the language of the article had been, 'beginning on the western bank of the Chattahoochee, and running thence up the river,' and no more had been said, the middle of the thread of the river ordinarily, and without any reference to the fact that Georgia was the proprietor of the river, it would have been said to be the dividing line between the two States. But there is added, 'running up the said river Chattahoochee, and along the western bank thereof.' This last controls any uncertainty there may be, for if the first call or object to locate the line is the bank of the river, it is plain that the western limit of Georgia, on and along the bank of the river, must be where the bank and the water meet in its bed, within the natural channel or passage of the river." To like effect is the ruling in *Daniels* v. *Cheshire Railroad Co.* 20 N. H. 85; *Bradford* v. *Cressy*, 45 Maine, 9. See, also, RICHARDSON, J., *in arguendo* in *Rix* v. *Johnson*, 5 N. H. 520; and *Fire Ins. Co.* v. *Stevens*, 87 N. Y. 287.

None of the cases cited in argument by counsel for respondents goes to the extent of holding that where a line is described as *running on a particular bank* of the stream, it in fact runs in the *middle* of the stream. In *Piper* v. *Connelly et al.* 108

Ill. 646, we held the plat on the back of the deed to be a part of the description of the premises conveyed, and it showed the river—not the bank—to be the line. In *Helmer* v. *Castle*, 109 Ill. 664, there was a conveyance bounding the property conveyed, *by a road*, and it was simply held that this carried title to the center of the road; and in *Trustees of Schools* v. *Schroll et al.* 120 Ill. 509, the boundary was upon a lake or pond, and we but there repeated the general doctrine before herein recognized. In *Inhabitants of Ipswich, Petitioners*, 13 Pick. 431, the line is described as running, "and *by Ipswich river to* a wall, \* \* \* then *by said wall*," etc.; and this, it was held, made the center of the river and of the wall the line. In *Cold Spring Iron Works* v. *Inhabitants of Tolland*, 9 Cush. 492, the language is, "bounding *on said west branch of Farmington river*, as the same runs," etc., and it was held the center of the stream was the line. And in *Luce* v. *Cooley*, 24 Wend. 451, the only remaining case cited that it is deemed necessary to notice, the language is, (after giving certain monuments,) "from thence *down the river as it winds and turns*," etc., and it was held that the grantee took to the middle of the river.

The language here used, in regard to Gordon's branch, is within those cases, and the line there is undoubtedly the middle of the stream. But the language describing the line, when Cahokia creek is reached, is radically different, and the fact that it is so different is conclusive that it was not intended that it should convey the same meaning. Thus, the description of the line is, "to Gordon's branch; thence *down the meanderings of said branch*, to the margin of Cahokia creek; thence *down on the left bank of said creek*," etc. If this does not clearly say that the line shall run "*down on the left bank* of Cahokia creek," then it would seem impossible to express that idea. There is no ambiguity in the language, and we are aware of nothing to prevent its having its usual effect, in this connection.

But it is further contended by counsel for respondents, that even if it shall be held that the line does not run in the middle

of the stream, it must be held that it runs where the water and land meet at low water. But low-water mark is not the *bank* of a stream. It is the point to which the stream recedes at its lowest stage. The banks of the stream, on the other hand, are "the elevations of land which confine the waters in their natural channel, when they rise the highest and do not overflow the banks." (Gould on Waters, sec. 45.) In *Howard* v. *Ingersoll, supra,* WAYNE, J., in speaking of the like question there under consideration, said: "The call is for the bank, —the fast land which confines the water of the river in its channel or bed, in its whole width. That is to be the line. The bank, or the slope from the bluff, or perpendicular of the bank; may not be reached by water for two-thirds of the year; still the water-line impressed upon the bank above the slope is the line required by the commissioners, and the shore of the river, though left dry for any time, and but occasionally covered by water in any stage of it, to the bank, was retained by Georgia as the river up to that line." The same line was again considered by the same court in *State of Alabama* v. *State of Georgia,* 23 How. 505, and the court repeated its former ruling, holding that the line ran *on the west bank* of the Chattahoochee river; that the bed of that river belonged to Georgia, and that it included that portion of the soil which is "alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn." To like effect, see, also, Gould on Waters, sec. 200.

The rulings of the circuit court in instructing the jury were substantially in harmony with this view of the law, and we therefore think the jury were properly instructed.

We have given careful consideration to the evidence, and we think the clear preponderance is with the finding of the

jury, that the east end of the bridge is not within the incorporated town of Edwardsville. A mistake in the abstract makes Dr. Spillman say: "Allowing the end of the new bridge to rest a foot and a half over the east abutment, which is the usual way of placing them, the east end of the bridge would be about four feet on the up-stream side, and about three feet on the lower-stream side, *east* of the east line of the bank of the creek." The record shows that the word "east," here italicized, should be *west*. The witness was asked: "Allowing a foot and a half to two feet of the new bridge to rest upon the east abutment here, I will ask you to state how far the east end of the bridge would be from the margin of the creek, on the east side of the creek?" And he answered: "On the up-stream side I think it would be about something near four feet, and on the lower-stream side probably miss it as much as three feet, or two and a half, inside of this east line of the bank." The witness had, moreover, previously stated: "The margin of the east bank of Cahokia creek is east of the eastern pier or abutment of the bridge," and also that "the east end of the bridge, if it rests on this old abutment pier, would be west of the eastern line of the bank of the creek." There is contradictory evidence on this question, but this mistake in the abstract being corrected, in our opinion the preponderance is, as before observed, with the finding of the jury.

We think, on the authority of *The People ex rel. Commissioners* v. *Board of Supervisors*, 100 Ill. 640, *Town of New Boston* v. *Supervisors of Mercer County*, 110 id. 197, *Supervisors of Will County* v. *The People ex rel.* id. 511, *Supervisors of Stark County* v. *The People ex rel.* 118 id. 459, and *Board of Supervisors of Macon County* v. *The People ex rel. supra*, the relators are, on the findings of the jury and the evidence before us, entitled to a *peremptory writ of mandamus*, as prayed in the petition, and it will issue accordingly.

*Peremptory mandamus awarded.*