Rel: April 11, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0677

_____

### Canaan Land Ministries a/k/a Canaan Land Church

### v.

### Luther E. Jones, Jr., and Kay Jones

### Appeal from Autauga Circuit Court
### (CV-20-900032)

FRIDY, Judge.

Canaan Land Ministries a/k/a Canaan Land Church ("Canaan") appeals from a summary judgment of the Autauga Circuit Court ("the trial court") in favor of Luther E. Jones, Jr., and Kay Jones. For the reasons set forth herein, we reverse the trial court's summary judgment

and remand the case for the entry of a summary judgment in favor of Canaan.

Background

This case involves a boundary-line dispute between owners of adjacent parcels of land. The Joneses own the parcel to the west of Canaan's parcel. The two parcels are divided by White Water Creek. At some point in the past, a dam was constructed on White Water Creek that created a large pond. The pond's western edge served as the boundary between the two parcels, with Canaan owning the entire pond. The dam failed in 2018 causing the pond to drain, leaving only the original course of White Water Creek.

On January 28, 2020, the Joneses filed a verified complaint against Canaan. In their complaint, they asserted that there was a dispute between Canaan and them over the proper location of the boundary line between their respective properties and that Canaan had been using a part of the Joneses' property without the Joneses' consent. The Joneses alleged that the land between the western edge of the former White Water Creek pond and the new western edge of the bank of the White Water Creek ("the disputed property") was their property. The Joneses

sought an order permanently enjoining Canaan from entering the disputed property or interfering with their possession. They also asked the trial court to enter a judgment establishing the common boundary line between the properties as described in their warranty deed.

Canaan filed an answer in which it denied the material allegations of the complaint. It also filed a counterclaim in which it asserted that a dispute existed regarding the true boundary line between its property and the Joneses' property. Canaan requested that the trial court determine and establish the correct boundary line. It also claimed a right, title, lien, or encumbrance over a portion of the property based on its warranty deed. In addition, Canaan argued that it was entitled to the disputed property based on adverse possession. Canaan requested that the trial court declare it the rightful owner of the disputed property in fee simple and establish the correct boundary line.

In April 2023, the parties filed cross-motions for a summary judgment. The evidence submitted in support of those motions, along with the Joneses' verified complaint and the verified discovery responses contained in the record, indicated the following.

Canaan purchased its parcel in 1983. The deed conveying the parcel to Canaan described the relevant portion of the western boundary of the parcel as:

> "thence west along the line of the Old Camp Ground line to the West bank of Whitewater Creek, thence South along the west bank of Whitewater Creek to the pond, <u>thence South along the west bank of the pond to 50 feet south of the dam</u>, marked as the corner. Said pond contains 70 acres, more or less …."

(Emphasis added.) Because, as noted, Canaan's property was located on the eastern side of White Water Creek and the pond, the fact that the deed described the relevant portion of the western boundary of the property as being on the west side of White Water Creek and the pond meant that the creek and the pond were located entirely on Canaan's property.[1] The deeds in Canaan's chain of title, going back at least as far as 1915, likewise described the property's western boundary as the west bank of the pond.

In an affidavit Canaan submitted in support of its summary-judgment motion, Connie Scott, the Chief Mapper for the Autauga

---

[1]The deed to Canaan indicated that the conveyance was made subject to "that certain easement heretofore granted in Grantors herein by Carl H. Stewart, Jr. and his wife, Carolyn Griggs Stewart as the same is set out and described" in a recorded instrument, but the document reflecting that easement is not contained in the record.

4

County Revenue Commissioner, testified that the western boundary of Canaan's property was the west bank of the pond and that Canaan's property, "including the entire pond," had been assessed for taxes annually in Canaan's name for a period exceeding ten years.

After it purchased the property, Canaan used the property to the west bank of the pond, including using the pond for fishing and other recreational activities. In 2018, the dam on White Water Creek failed, which caused the pond to drain. Although Canaan had attempted to rebuild the dam, it was unable to do so because of the cost.

The Joneses purchased their property located to the west of White Water Creek in March 2019. The deed by which the property was conveyed to the Joneses described the eastern boundary of the relevant portion of their property as:

> "[B]eginning at the West end of the dam of White Water Lake, and also known as Ballard's Pond, and run due West to the Section line between Sections 10 and 11; thence North to the Northwest corner of said quarter section; <u>thence East to White Water Creek; thence down said creek or edge of said pond to the point of beginning</u> …."

(Emphasis added.) The deed also provided that the grantor did "not warrant the amount of acreage included in [the] conveyance and [made]

no representations or warranties as to the boundary lines of the property." The deed by which the Joneses' predecessor in title was conveyed the property in 1965 described the eastern boundary of the property in the same way as the deed to the Joneses, but it did not contain the same limitation as to a warranty respecting the acreage and boundaries of the property.

In response to an interrogatory asking the Joneses the substance of their knowledge or opinion supporting their claims, the Joneses responded: "Since the spillway broke and no repairs made[,] now there is no 'said pond edge' only the White Water Creek is the boundary."

In April 2019, Caleb Gober, representing Canaan, approached the Joneses about purchasing the land to the west of White Water Creek where the pond had been. Gober indicated that if the Joneses would have that property surveyed, Canaan would purchase it. However, after the Joneses had the property surveyed, Gober indicated that Canaan could not afford to purchase the property.

In its summary-judgment motion, Canaan argued that the boundary line should be the western bank of where the pond had been. It asserted that because the failure of the dam had caused a sudden and

6

artificial change in the edge of the waters, the boundary remained the same as it had -- i.e., the western edge of where the pond had been -- and had not changed with the receding water line. Canaan also argued that it had satisfied the elements for adverse possession of the disputed property.

In their summary-judgment motion, the Joneses argued that the boundary line should be the west bank of White Water Creek in its present state, writing: "It is undisputed now that there is no pond, lake, or standing water between the parties['] recognized land lines other than the banks of White Water Creek which has moved over time as a creek or running stream may do due to erosion, precipitation and other natural factors." They argued that there had been no controversy between the parties as to the boundary between their properties until Gober had approached them about purchasing the property where the pond had previously been, and they argued that the fact that Canaan had offered to purchase that portion of property from them demonstrated that Canaan did not adversely possess that property. They also argued that the parties' predecessors in title had entered into two agreements settling a boundary-line dispute between them pursuant to which

7

Canaan's predecessors in title had granted to the Joneses' predecessors in title and their children a nontransferrable right to the recreational use of the pond, and the Joneses' predecessors in title had conveyed to Canaan's predecessors in title the property representing the pond. The Joneses did not offer any evidence in support of either of those purported agreements, however.[2] Finally, the Joneses argued that "[t]he erosion of the dam over a period of time created leakage and gradual receding of water until there was no water left," and, as a result, the boundary line between the properties changed with the edge of the receding waters. Again, however, they offered no evidence in support of that contention.

On July 16, 2024, the trial court denied Canaan's motion for a summary judgment and entered a summary judgment in favor of the Joneses. The trial court held that there was no genuine issue of material fact and that the Joneses were entitled to a judgment as a matter of law.

---

[2]The references to those purported agreements may relate to the easement mentioned in Canaan's deed, see note 1, supra, but the record is not clear on this point, and, again, neither the easement referenced in the deed nor any documents relating to the purported agreements the Joneses discuss in their summary-judgment motion were made part of the record.

The trial court determined that the boundary between the parties' properties was the west bank of White Water Creek. Canaan appeals.

Standard of Review

Our review of a summary judgment is de novo, applying the same standard as the trial court to determine whether a genuine issue as to any material fact exists and, if not, whether the moving party is entitled to a judgment as a matter of law. Mackey v. Davis, 297 So. 3d 422, 428 (Ala. Civ. App. 2019); Rule 56(c)(3), Ala. R. Civ. P. If a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the opposing party to proffer substantial evidence demonstrating the existence of a factual dispute. Mackey, 297 So. 3d at 428. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989). "In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw." Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So. 2d 369, 372 (Ala. 2000).

Analysis

We begin our analysis by noting that both the grant of the Joneses' summary-judgment motion and the denial of Canaan's summary-judgment motion are properly before us. "Ordinarily, a party may not appeal from the denial of a summary-judgment motion." Mountain Lakes Dist. v. Oak Grove Methodist Church ex rel. Green, 126 So. 3d 172, 180 (Ala. Civ. App. 2013). However, "[w]here cross-motions for a summary judgment are filed in the trial court, the party whose motion was not granted is entitled to have that motion reviewed on an appeal from the grant of the opponent's motion …." Id.

Canaan contends that the trial court erred in entering the summary judgment for the Joneses and in incorrectly establishing the boundary line as "the West Bank of White-Water Creek." Canaan asserts that the boundary line should instead be set where the western bank of the pond had existed prior to the failure of the dam in 2018 based on the language of the parties' deeds and the fact that the stated boundary had changed due to an avulsion, or a sudden and violent change in the water level of the pond. We agree with Canaan.

The record on appeal establishes that the boundary line between the Joneses' property and Canaan's property was the western boundary of the pond. The question that faced the trial court, and which we face now, is what happens when a boundary is affixed to the shore or bank of a body of water and the location of the shore or bank changes? The answer to that question rests on common-law principles that have changed very little over the centuries.

Describing the effect of changes to a body of water that serves as a boundary between properties, Henri de Bracton, a 13th century English jurist, wrote in his work, <u>On the Laws and Customs of England</u>:

> "[Soil] which a river adds to your land by alluvion becomes yours by the <u>jus gentium</u>. Alluvion is an imperceptible increment which is added so gradually that you cannot perceive [how much] the increase is from one moment of time to another. Indeed, though you fix your gaze on it for a whole day, the feebleness of human sight cannot distinguish such subtle increases, as may be seen in [the growth of] a gourd and other such things. On the other hand, if the increment is not imperceptible but apparent it will be otherwise, as where the violence of a stream has swept away a parcel of your land and attached it to that of your neighbour; it is clear that it remains yours."

2 <u>Bracton on the Laws and Customs of England</u> 44 (George E. Woodbine ed., Samuel E. Thorne trans., Harvard Univ. Press 1968) (footnote

omitted). Centuries later, in the 18th century, Sir William Blackstone described the common-law rule in similar fashion:

> "[I]f a river, running between two lordships, by degrees gains upon the one, and thereby leaves the other dry; the owner who loses his ground thus imperceptibly has no remedy: but if the course of the river be changed by a sudden and violent flood, or other hasty means, and thereby a man loses his ground, he shall have what the river has left in any other place, as a recompence for this sudden loss."

2 William Blackstone, Commentaries on the Laws of England *262 (footnote omitted). In 1928, our supreme court described the common-law rule as it presently stands:

> "'Where, by a sudden and violent or artificial change, the channel or shore on which riparian or littoral lands are bounded is shifted, the boundaries of such lands are unaffected, and remain in their original position; but where the change is gradual and imperceptible, whether caused by accretion, reliction, or encroachment, the boundaries shift with the shifting of the channel or shore. If the land of the riparian proprietor is increased he is not accountable for the gain, and if it is diminished he has no recourse for the loss. … It is only when the change in the stream is sudden, violent, or visible that the title remains the same. It is not enough that the change may be discerned by comparison at two distinct points of time. It must be perceptible when it takes place. The test as to what is gradual and imperceptible in the sense of the rule is that, although the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on.'"

Greenfield v. Powell, 218 Ala. 397, 399-400, 118 So. 556, 558 (1928) (quoting 9 C.J. Boundaries § 82 (1916)). See also Robinson v. Harrigan Timberlands Ltd. P'ship, 371 So. 3d 839, 843 (Ala. 2022) (plurality opinion) (describing the development of the common-law rule).

Applying this common-law rule, the question whether the boundary line remained stationary or moved with the recession and ultimate disappearance of the pond requires us to consider whether the change in the pond resulted from a gradual or imperceptible change (i.e., by reliction, the "process by which a river or stream shifts its location, causing the recession of water from its bank," Black's Law Dictionary 1544 (11th ed. 2019)), or from avulsion, a "'sudden and violent or artificial change,'" Greenfield, 218 Ala. at 399, 118 So. at 558 (quoting 9 C.J. Boundaries § 82 (1916)). If the former, then the trial court properly fixed the boundary between the Joneses' and Canaan's property as the west bank of White Water Creek. If the latter, the trial court should have fixed the boundary between the properties as the location where the shore of the pond existed before the dam failed.

Recently, in Robinson v. Harrigan Timberlands Limited Partnership, 371 So. 3d 839 (Ala. 2022) (plurality opinion), our supreme

13

court addressed a boundary-line dispute between adjacent landowners whose deeds established a particular creek as the east/west boundary of their lands. Robinson, 371 So. 3d at 840. To the east of the then-current channel of the creek was an old creek bed that the property owner to the west of the creek, Robinson, claimed was the actual creek referred to in both landowners' deeds. Id. The land between the current channel of the creek and the old creek bed was approximately 12.5 acres. Id.

After the property owner to the east of the creek, Harrigan Timberlands Ltd. Partnership ("Harrigan"), cut and sold timber on the land between the creek and the old creek bed, Robinson sued Harrigan and other timber companies for trespass, wrongful cutting of timber, and conversion. Id. at 841-42. The circuit court entered a summary judgment in favor of Harrigan and the timber companies, and Robinson appealed. Id. at 841.

On appeal, Robinson argued that the old creek bed formed the boundary between the properties because the creek had shifted from the old bed by avulsion. Id. at 845. Chief Justice Parker, in a plurality opinion joined by three other justices, with five justices concurring in the result without separate writings, held that Robinson had failed to carry his

burden in the circuit court of putting on evidence indicating that the creek had shifted suddenly as the result of an avulsion. Id. at 845-47. The plurality acknowledged that Robinson had presented some evidence indicating that the creek had shifted from the old creek bed to its current location at some point in the past. Id. For example, Robinson pointed out that the deed to his property was for an amount of acreage that would have included the property in dispute, and he testified at deposition that, when he was twelve years old, his grandfather had told him that the old creek bed was the boundary line between the properties. Id. Robinson also pointed to a news article from 1926 indicating that a river in the county in which the properties were located had experienced heavy flooding, although the news story did not mention the creek. Id. at 847. None of that evidence, the plurality concluded, showed that the creek had shifted as a result of an avulsion.[3] Id. at 845-47. Thus, it concluded, Robinson had not carried his burden in responding to Harrigan and the

---

[3]The plurality rejected other evidence as well, including testimony from a surveyor that Robinson did not present until after the circuit court had entered the summary judgment and a proposed inference from a survey that was not supported by necessary expert testimony. Robinson, 371 So. 3d at 845-47.

other timber companies' summary-judgment motion, and the supreme court affirmed the circuit court's judgment. Id. at 847.

Unlike in Robinson, in the present case, the evidence Canaan submitted in support of its summary-judgment motion and in opposition to the Joneses' summary-judgment motion showed, undisputedly, when the edge of the pond changed and why it changed. More importantly, it showed that the change was sudden. Specifically, the evidence showed that, for over a century, the deeds in the line of Canaan's title to its property fixed the property's western boundary as the western bank of the pond, and that, for at least fifty years, the deeds in the line of the Joneses' title to their property fixed the eastern boundary of their property similarly. The evidence submitted on summary judgment included pictures depicting a large pond that supported recreational activities. The evidence showed that, in 2018, a dam on White Water Creek failed, causing the pond to drain, a change that affidavit testimony described as "sudden and drastic," such that, by the time the Joneses purchased their property in March 2019, the pond was no longer there. Given those undisputed facts, we find that the failure of the dam and the

16

draining of the pond was a sudden and violent event that constituted an avulsion.

In their brief on appeal, the Joneses refer to a purported "Boundary Line Agreement and Easement Deed," which, they say, was executed by the parties' predecessors in title. They say that the agreement "specifically addressed the property boundary at issue in this matter" and "expressly established the coterminous property boundary line at issue 'where the original West bank of What Water Creek' was located." Based on the citations contained in their brief, it appears that their argument about this purported agreement relates to the argument contained in their summary-judgment motion, discussed above, that the parties' predecessors in title had entered into agreements settling a boundary-line dispute between them. As noted, the Joneses did not attach a copy of any such agreements to their summary-judgment motion, nor do copies of any such agreements otherwise appear in the record. In addition, the Joneses did not submit any affidavit testimony attesting to the existence of any such agreements or the terms of any such agreements.

"'[S]tatements in motions are not evidence and are therefore not entitled to evidentiary weight.' Singh v. Immigration & Naturalization

Serv., 213 F.3d 1050, 1054 n.8 (9th Cir. 2000). '[B]riefs submitted in support of motions are not evidence to be considered by the Court in resolving a summary judgment motion.' Direct Media Corp. v. Camden Tel. & Tel. Co., 989 F. Supp. 1211, 1217 (S.D. Ga. 1997)." Fountain Fin., Inc. v. Hines, 788 So. 2d 155, 159 (Ala. 2000). Because the Joneses provided only argument about -- but produced no evidence of -- the purported agreements they cited in their summary-judgment motion, the trial court was not authorized to grant their motion or to deny Canaan's motion based on those alleged agreements. As a result, we cannot, on the basis of the Joneses' argument to this court about those alleged agreements, affirm the trial court's summary judgment in their favor.

### Conclusion

The undisputed evidence showed that the pond referenced in the Joneses' and Canaan's deeds changed dramatically because of an avulsion, and, as a result, the location of the boundary line between their properties -- which had been set by both parties' deeds as the edge of the pond -- remained stationary and did not change with the recession and disappearance of the pond. The trial court erred when it concluded otherwise and granted the Joneses' motion for a summary judgment

while denying Canaan's motion for a summary judgment. As a result, we reverse the trial court's judgment, and we remand the cause to the trial court for the entry of a summary judgment in favor of Canaan that establishes the boundary between the parties in conformity with this opinion.[4]

REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Edwards and Hanson, JJ., concur.

Lewis, J., recuses himself.

---

[4]Having resolved the appeal in this manner, we do not reach Canaan's contention that it had obtained the disputed property by adverse possession.